## COMMONWEALTH *vs.* ULISES RAMIREZ.

No. 06-P-497.

Hampden. January 17, 2007. - May 10, 2007.

Present: GRASSO, SMITH, & MILLS, JJ.

*Sex Offender. Sex Offender Registration and Community Notification Act. Idle and Disorderly Person. Statute,* Construction.

The evidence at a criminal trial was insufficient to support the defendant's conviction on a complaint that he failed to register as a sex offender, in violation of G. L. c. 6, § 178H, where the Commonwealth failed to demonstrate beyond a reasonable doubt that the defendant had personal knowledge, as of the date alleged in the complaint, of the requirement that he register but failed to do so. [11-16]

The evidence at a criminal trial was insufficient to support the defendant's conviction of accosting or annoying a person of the opposite sex, G. L. c. 272, § 53, where the defendant's words and actions, without more, did not create a physically offensive or threatening condition as required by the statute. [16-22]

COMPLAINT received and sworn to in the Springfield Division of the District Court Department on July 7, 2005.

The case was heard by *William J. Boyle,* J.

*Elaine Fronhofer* for the defendant.

*Sidney E. Reavey,* Assistant District Attorney, for the Commonwealth.

MILLS, J. After a jury-waived trial, the defendant was found guilty on a complaint that he knowingly failed to register as a sex offender, G. L. c. 6, § 178H, and accosted or annoyed a person of the opposite sex, G. L. c. 272, § 53. We conclude that there was insufficient evidence to support the defendant's convictions, and we reverse.

*Background.* The Commonwealth presented evidence that on

July 2, 2005, the complainant[1] went to a public swimming pool in Springfield, accompanied by a friend. While in the pool, she noticed the defendant, a stranger, staring at her. When the complainant began to leave, the defendant asked her why she was leaving. The complainant ignored the defendant and left the pool.

The following day, while walking to a store near her home, the complainant encountered the defendant a second time. As she passed by a house, he leaned out a window, removed his hat, and said he would buy her candy. The complainant had not previously seen the defendant in the neighborhood. The defendant did not follow her to the store, but when she returned, he was standing outside the same house and "singing that he fell in love with a little girl." He asked the complainant if she had bought what he told her to buy. She crossed the street to her home, and as she proceeded up the stairs, the defendant watched her. Both encounters made the complainant feel "uncomfortable."

Subsequent investigation revealed that in 1984, the defendant had been convicted of a sex offense[2] for which registration later came to be required pursuant to the sex offender registration statute, G. L. c. 6, §§ 178C-178Q, and that the defendant had not registered as a sex offender. The relevant statute was enacted in 1999, but applies retroactively to all persons convicted of sex offenses after August 1, 1981. G. L. c. 6, § 178C. See *Roe* v. *Attorney Gen.*, 434 Mass. 418, 423-424 (2001). Steven Cartney, a keeper of the records for the Sex Offender Registry Board (SORB), testified that sex offenders convicted prior to the statute's enactment, and for whom the SORB had addresses, were informed by mail of their obligation to register. Because the SORB did not have an address for the defendant, it did not

[1]According to the transcript, the complainant testified at the trial on October 14, 2005, that she was eighteen years old and in the seventh grade. The arrest report, entered in evidence by the defendant, lists the complainant's birth date as August 24, 1992, and further states that she was twelve years of age. On appeal, neither party's brief makes reference to the complainant's age, though the Commonwealth states that she was in the seventh grade at the time of the incidents giving rise to the charges.

[2]The record does not definitively disclose the crime of which the defendant was convicted. A witness for the Commonwealth stated that he "believe[d]" the offense was rape and abuse of a child.

mail him a notification. However, notices of sex offender registration requirements were published in Massachusetts newspapers in 2001 or 2002.[3] On August 2, 2002, the defendant was "placed in violation" for failure to register with the SORB.[4] He was arrested on July 6, 2005, and a two-count complaint charging him with failure to register as a sex offender and accosting or annoying a person of the opposite sex was issued the following day. As of the date of trial on October 14, 2005, the defendant had not yet registered.

Defense counsel moved for required findings as to both charges. Those motions were denied. On appeal the defendant argues that the evidence was insufficient to show that (1) his failure to register with the SORB was knowing, as required by G. L. c. 6, § 178H, and (2) his language or acts were disorderly, as required by G. L. c. 272, § 53.[5]

*Defendant's failure to register.* According to G. L. c. 6, § 178H(*a*), as appearing in St. 1999, c. 74, § 2, "[a] sex offender required to register pursuant to this chapter who knowingly: (i) fails to register . . . shall be punished in accordance with this section." The defendant does not dispute that his 1984 conviction subjects him to the registration mandates of the statute, but argues that the Commonwealth failed to introduce evidence sufficient to prove beyond a reasonable doubt that his failure to register with the SORB was knowing. We agree.

It is a settled rule of statutory construction that all words in a statute must be given meaning. *Commonwealth* v. *Burgess*, 426 Mass. 206, 224-225 (1997). Therefore, "[t]he insertion of [the word 'knowingly' into the statute] cannot be treated as immaterial." *Commonwealth* v. *Horsfall*, 213 Mass. 232, 237 (1913). "When the word 'knowingly' is used in a criminal statute, it

---

[3]The evidence indicates that in 2002, such notices were published three times in each of at least fourteen Massachusetts newspapers. It is unclear what notices were also published in 2001.

[4]The record contains no explanation of the term "placed in violation." We assume it reflects that the defendant was identified in the SORB database as a person unregistered despite a requirement that he register.

[5]The defendant also claims that the single justice committed an abuse of discretion in denying his motion for a stay of execution of his sentence pending determination of his appeal. Notwithstanding our holding, we are not persuaded that there was an abuse of discretion by the single justice.

'commonly imports a perception of the facts requisite to make up the crime.' " *Commonwealth* v. *Fondakowski*, 62 Mass. App. Ct. 939, 940 (2005), quoting from *Commonwealth* v. *Altenhaus*, 317 Mass. 270, 273 (1944). Thus, where the statute under which the defendant was charged defines the offense as "knowingly . . . fail[ing] to register," G. L. c. 6, § 178H, the Commonwealth was required to prove that the defendant knew of the requirement that he register but did not do so despite this knowledge.

While the defendant's knowledge may be proven by circumstantial evidence, the proof must be specific to *this* defendant, rather than to the general population or some subset thereof. See, e.g., *Commonwealth* v. *Dellamano*, 393 Mass. 132, 136 (1984) ("We have held that where 'knowledge . . . is an essential element of the offence charged, proof of that knowledge is a prerequisite to conviction. The knowledge of the defendant is personal to him and the statute recognizes no substitute' "), quoting from *Commonwealth* v. *Holiday*, 349 Mass. 126, 128 (1965); *Commonwealth* v. *Rosenberg*, 379 Mass. 334, 338 (1979). Absent a defendant's conscious disregard of the information necessary to provide him with the requisite knowledge, the Commonwealth cannot meet its burden merely by establishing that the knowledge was available to the defendant. See, e.g., *Commonwealth* v. *Altenhaus*, *supra*; *Commonwealth* v. *Boris*, 317 Mass. 309, 315 (1944); *Commonwealth* v. *Thureson*, 371 Mass. 387, 390 (1976).

It warrants noting that, like the Massachusetts statute, the sex offender registration laws of at least five other States impose liability specifically when a sex offender knowingly fails to register. Alaska Stat. § 11.56.840 (2006); Del. Code Ann. tit. 11, § 4120 (2001 & Supp. 2006); Utah Code Ann. § 77-27-21.5(14) (Supp. 2006); Va. Code Ann. § 18.2-472.1 (Supp. 2006); Wash. Rev. Code § 9A.44.130(11) (Supp. 2007). Of these States, those that have addressed the statutes' respective knowledge requirements have made clear that the State must prove that the defendant knew of his duty to register but failed to do so. See *Dailey* v. *State*, 65 P.3d 891, 895 (Alaska Ct. App. 2003) ("to convict [the defendant], the State had to prove both that [he] was aware of the circumstances giving rise to his duty

to file sworn quarterly written verifications and that he knowingly refrained from performing that duty"); *Kitze* v. *Commonwealth*, 23 Va. App. 213, 217 (1996) ("A knowing and intentional failure to register is punishable . . ."); *State* v. *Clark*, 75 Wash. App. 827, 832 (1994) ("Lack of notice of the duty to register constitutes a defense to the crime of knowingly failing to register as a sex offender — but only for the first such offense" because thereafter the arrest for failure to register serves as notice). Similarly, California's sex offender registration statute prescribes punishment for wilful violations thereof, and proof of guilt thereunder "requires *actual knowledge* of the duty to register." *People* v. *Sorden*, 36 Cal. 4th 65, 69 (2005), citing *People* v. *Garcia*, 25 Cal. 4th 744 (2001). See Cal. Penal Code § 290(g) (Deering 1985 & Supp. 2006).

While G. L. c. 6, § 178H, and the other sex offender registration statutes discussed above plainly require proof of the defendant's knowledge of the registration mandate, constitutional due process requirements provide additional support for our construction of the knowledge requirement. See *Commonwealth* v. *Nieves*, 446 Mass. 583, 597-598 (2006) (statutes are to be interpreted to avoid unconstitutionality). In *Lambert* v. *California*, 355 U.S. 225 (1957), the United States Supreme Court addressed the constitutionality of a Los Angeles ordinance making it illegal for convicted felons to remain in the city for more than five days without registering with the chief of police. The Supreme Court reversed the appellant's conviction under the ordinance, holding that "actual knowledge of the duty to register or proof of the probability of such knowledge and subsequent failure to comply are necessary before a conviction under the ordinance can stand."[6] *Id.* at 229.

With these principles in mind, we review the evidence in this

---

[6]Even when knowledge, wilfulness, or some other mens rea is not explicitly required by a sex offender registration statute, some jurisdictions have applied the *Lambert* rationale to require proof of actual knowledge or the probability thereof for a conviction under a sex offender registration statute. See *State* v. *Giorgetti*, 868 So. 2d 512, 519-520 (Fla. 2004); *State* v. *Young*, 140 N.C. App. 1, 12 (2000) ("although ignorance of the law is no excuse, and the statute at issue does *not* require the State to prove intent, due process requires that the defendant have knowledge, actual or constructive, of the statutory requirements before he can be charged with its violation"); *Varnes* v. *State*, 63 S.W.3d 824, 831 (Tex. Ct. App. 2001) ("due process requires actual notice or

case, doing so in the light most favorable to the Commonwealth. See *Commonwealth* v. *Latimore*, 378 Mass. 671, 676-677 (1979). The Commonwealth first argues that the defendant's receipt of actual notice of his duty to register at the time of his arrest is sufficient to satisfy the statute's knowledge requirement because his failure to register was a "continuing offense."[7] However, the Commonwealth did not pursue this theory at trial,[8] instead focusing on the defendant's alleged knowledge of his duty to register *prior* to his arrest. Even had the Commonwealth adequately presented its theory, we point out that July 6, 2005, is listed on the complaint as the sole offense date, and no range of dates is provided. "When [a continuing] offense is charged, the time period specified in the indictment is an integral part of the crime, and evidence of acts committed outside this period is generally not admissible to prove the crime." *Commonwealth* v. *Megna*, 59 Mass. App. Ct. 511, 513 (2003). On this record there is no evidence that on the day of his arrest the defendant received notice of the registration requirement. The mere fact of his arrest, without evidence that he was informed that day precisely what he was arrested for, is not enough. We also note that the complaint did not issue, and that the arraignment was not held, until the day following the arrest. Thus, knowledge growing out of the arrest was not shown to have been gained by the defendant prior to July 7, 2005, the day after the date of offense listed on the complaint. In sum, the defendant was not charged or convicted of

the reasonable probability of actual notice before violation of a registration statute can be prosecuted against an individual"). Compare *People* v. *Patterson*, 185 Misc. 2d 519, 526 (N.Y. Crim. Ct. 2000) ("[T]he People do not need to allege or prove that a sex offender charged with failure to register acted knowingly or intentionally. However, . . . it is nevertheless plain that before a defendant can be prosecuted for failure to register, he must first be given the statutorily mandated notice of his duty to register as a sex offender. Such notice is also likely required by due process of law"). But see *State* v. *Cook*, 83 Ohio St. 3d 404, 420 (1998) ("The act of failing to register alone, without more, is sufficient to trigger criminal punishment . . .").

[7]"A continuing offense is an indivisible, unlawful general practice that exists throughout the time span alleged." *Commonwealth* v. *Megna*, 59 Mass. App. Ct. 511, 513 (2003).

[8]The only evidence offered to support such a theory consisted of Cartney answering "yes" in response to the prosecutor asking "[a]nd is [the defendant] as far as you know in violation today?" The prosecutor's opening statement did not address the defendant's knowledge, and the prosecutor's closing focused solely on prearrest knowledge.

a failure to register after July 6, 2005. "It is elementary in the criminal law of this Commonwealth that '[t]he offence must not only be proved as charged, but it must be charged as proved.' " *Commonwealth* v. *Collardo*, 13 Mass. App. Ct. 1013, 1014 (1982), quoting from *Commonwealth* v. *Ancillo*, 350 Mass. 427, 430 (1966).

The Commonwealth next asserts that the defendant's prearrest knowledge of his duty to register may be inferred from evidence introduced at trial regarding the publication of notices informing sex offenders of their duty to register. In the light most favorable to the Commonwealth, the evidence showed that on certain dates in 2001 and 2002, the SORB published notices in at least fourteen newspapers in the Commonwealth, including the Springfield Union News, Boston Globe, and Boston Herald, stating that individuals convicted of sex offenses on or after August 1, 1981, were required to register with the SORB. However, there was no evidence that the defendant read any newspaper, much less that he did so with some regularity. Furthermore, there was no evidence that the defendant was even in the Commonwealth at any of the times when the notices were published, or that the notices' contents were communicated to him in any other way.

The Commonwealth points to evidence that 600 sex offenders registered with the SORB in response to, or at least after, the newspaper notices, and cites *Lambert* v. *California*, 355 U.S. at 229, for the proposition that "proof of the probability of [actual] knowledge" is sufficient to prove the defendant's knowledge as required for a conviction for failure to register. The reference to 600 registrants is, alone, insufficient to prove anything, let alone that the defendant here was informed by a published notice.[9] The Commonwealth's evidence of notices published in Massachusetts newspapers was insufficient to permit an inference beyond a reasonable doubt in this case that the defendant read such a notice and was therefore informed of

---

[9]At trial, there was no testimony regarding what percentage of unregistered sex offenders this 600-person figure represented. At oral argument, the Commonwealth's attorney represented that there were an additional 16,000 sex offenders who, though similarly required, did not register. These numbers would suggest that 3.75 percent of those required to register did so after the notices appeared in Massachusetts newspapers.

his duty to register. The defendant's conviction for knowingly failing to register as a sex offender must be reversed.

*Accosting or annoying a person of the opposite sex.* The defendant next argues that the Commonwealth presented insufficient evidence to prove that his conduct was disorderly, as required for a conviction for accosting or annoying a person of the opposite sex under G. L. c. 272, § 53. In relevant part, the statute provides punishment for "persons who with offensive and disorderly acts or language accost or annoy persons of the opposite sex." G. L. c. 272, § 53, as appearing in St. 1983, c. 66, § 1. Thus, the Commonwealth must prove that the defendant's conduct was both offensive and disorderly. See *Commonwealth* v. *Lombard,* 321 Mass. 294, 296 (1947). The defendant argues that his conduct was not disorderly. As pertaining to the "accost or annoy" provision of G. L. c. 272, § 53, disorderly acts or language are "those that involve fighting or threatening, violent or tumultuous behavior, or that create a hazardous or physically offensive condition for no legitimate purpose of the actor, whether the resulting harm is suffered in public or in private." *Commonwealth* v. *Chou,* 433 Mass. 229, 233 (2001).

The Commonwealth argues that the defendant's conduct was disorderly both because it was physically offensive and because it was threatening.[10] Because the Commonwealth was required to prove "that the defendant's behavior was offensive and disorderly to a reasonable person," *Commonwealth* v. *Cahill,* 446 Mass. 778, 781 (2006), we reason that context is critical in analyzing convictions under G. L. c. 272, § 53, and must evaluate whether there was sufficient evidence to find that the defendant's conduct was threatening or physically offensive to a young woman.

The Commonwealth asserts that, despite an absence of physical contact between the defendant and the complainant, the " 'sexual overtones' of the defendant's behavior and words were sufficient to prove that his conduct was 'physically offensive' to a young woman." Our courts have not articulated

---

[10]The Commonwealth does not argue that the defendant's acts or language were disorderly in any of the alternative ways articulated in *Commonwealth* v. *Chou,* 433 Mass. at 233.

.

the specific requirements for a physically offensive condition. When words are not defined in a statute, we assign them "their usual and accepted meaning." *Commonwealth* v. *Whiting*, 58 Mass. App. Ct. 918, 920 (2003). In discussing "offensive acts or language," as that phrase is used in the accost or annoy provision of G. L. c. 272, § 53, the Supreme Judicial Court has stated that "[o]ffensive acts are those that cause 'displeasure, anger or resentment; esp., repugnant to the prevailing sense of what is decent or moral.' " *Commonwealth* v. *Cahill, supra* at 781, quoting from Black's Law Dictionary 1113 (8th ed. 2004). See *Commonwealth* v. *Whiting, supra* (providing the same definition for offensive conduct). Conduct is physical when it is "of or relating to the body." Merriam-Webster's Collegiate Dictionary 935 (11th ed. 2005).

While the Commonwealth acknowledges that the facts of the cases finding physically offensive words and actions are distinguishable from the instant facts, it asserts that the spirit of those cases supports a finding of physical offense here. We disagree.

The case of *Commonwealth* v. *Cahill, supra*, relied upon by the Commonwealth, and the one case we are able to identify that permitted an accost or annoy conviction based on the defendant's physically offensive conduct, elucidates the distinction between the instant defendant's actions and those rising to the level of physical offense. In *Cahill*, the defendant, who was training the victim as a cashier at the store where they were both employed, "forced his unwanted attentions on [the victim]," asking her out on dates more than twenty times, "occasionally touching her back," sometimes "graz[ing]" his body against hers, and often staring at her. *Commonwealth* v. *Cahill, supra* at 779. When the victim declined to telephone the defendant as he had requested her to do, "he approached [her] in an angry and confrontational manner [and] came close to her face." *Ibid.* After this encounter, "[t]he victim felt panicky and afraid for her safety outside the workplace." *Ibid.* The following month, the defendant approached the victim from behind, "grabbed [her] around the neck really tight with both arms around [her] shoulders and neck," and said, "I love you." *Ibid.* This incident left the victim feeling "frightened," and she experienced difficulty "concentrat-

ing at work, and had to take medication." *Id.* at 780. Though such a degree of severity of physical offense may not be required in order for words and actions to constitute physically offensive conduct under G. L. c. 272, § 53, the substantial distinction between the defendant's actions in *Cahill* and the instant defendant's actions cautions against imposition of criminal liability here.

The Commonwealth also relies upon *Commonwealth* v. *LePore*, 40 Mass. App. Ct. 543 (1996), in which the defendant removed the screen from the bedroom window of a ground floor apartment wherein a young woman lay sleeping, and had smoked two cigarettes outside this window by the time two police officers came upon him. We held that there was sufficient evidence to convict the defendant of being a disorderly person pursuant to G. L. c. 272, § 53,[11] because his acts constituted physically offensive conduct. *Id.* at 546, 549. As *LePore* makes clear, physical contact with a victim's person is not necessary to render one's actions physically offensive. Nonetheless, given the definitions of "offensive" and "physical" noted above, as well as the discussions of physically offensive conduct in both *LePore* and *Cahill*, some significant physically offensive conduct on the part of the defendant, comparable to removing the screen from one's window, is required to impose criminal liability.[12] Such conduct is lacking here.

In the light most favorable to the Commonwealth, the defendant stared at the complainant at the swimming pool and asked her why she was leaving when she began to leave. There

---

[11]Though physically offensive conduct can form the basis of both a disorderly person offense under G. L. c. 272, § 53, and an accost and annoy offense under the same statute, the elements of the two crimes are somewhat different. Nonetheless, given their clear similarities and genesis in the same statute, the Supreme Judicial Court has looked to at least one case discussing the former when analyzing the sufficiency of evidence for a conviction under the latter, and we do the same here. See *Commonwealth* v. *Cahill*, 446 Mass. at 782-783.

[12]Given the context-specific nature of a determination whether a defendant accosted or annoyed a person of the opposite sex, it would be imprudent for us to attempt to articulate a bright-line rule as to what is or is not "physically offensive." Future cases will no doubt assist in further clarifying the contours of this component of the offense.

was no evidence that the defendant said anything further to the complainant on that day, that he attempted to stop her from leaving the pool, or that he followed her when she left. The following day, the complainant passed by a house across the street from her own, the defendant's head emerged from a window of that house, he removed his hat, and he offered to buy her candy. The defendant did not follow the complainant to the store, but when she returned from the store, he was outside the house in which he had stood previously. As she walked by, the defendant sang a song about falling in love with a little girl, the complainant crossed the street to her house, and the complainant's friends confirmed the complainant's suspicion that the defendant was looking at her.

There is no evidence that the defendant attempted at any time to come near the complainant's person, restrict her movement, or otherwise create physical offense. As unwelcome and unsettling as the defendant's conduct may have been to the complainant, his words and actions, without more, were insufficient to create a physically offensive condition as required by the statute. Indeed, while the complainant may have found the defendant's conduct and actions somewhat offensive in that they made her feel uncomfortable, the evidence was insufficient for a finding of *physically* offensive conduct. Compare *Commonwealth* v. *Chou*, 433 Mass. at 233-234 (declining to find that the defendant's hanging of threatening and sexually degrading posters of his former girlfriend at her school created a physically offensive condition); *Commonwealth* v. *Whiting*, 58 Mass. App. Ct. at 918, 920 (finding statute violated where the defendant "used sexually explicit language toward" five girls, "pulled up his shirt and started rubbing his chest," and "pulled down his pants," causing the girls to feel "scared," "confused," "uncomfortable," "frightened," and "afraid," and to run for safety).

The Commonwealth also asserts that the defendant's actions were inherently threatening, particularly given the alleged "sexual overtones" implicit in his words and actions.[13] Though the term "threat" is not statutorily defined, for purposes of the

<hr/>

[13]When discussing this argument in its brief, the Commonwealth misstates some of the evidence. First, it says that while at the pool, the defendant made

offense of threatening to commit a crime under G. L. c. 275, § 2, it includes "an expression of intention to inflict a crime on another and an ability to do so in circumstances that would justify apprehension on the part of the recipient of the threat." *Commonwealth* v. *Troy T.*, 54 Mass. App. Ct. 520, 524 (2002), quoting from *Commonwealth* v. *Robicheau*, 421 Mass. 176, 183 (1995). Thus, for example, a defendant's conviction for being a disorderly person was upheld when his angry tirade through a court house included threatening words and actions, including screaming "watch out" while pointing his finger in the face of a prosecutor for whom he had an established history of disdain, stating that a particular judge is "f—ed now," and telling a court house employee to "[r]emember what happened in Oklahoma" and that "[t]his is a bomb ready to explode." *Commonwealth* v. *Sholley*, 432 Mass. 721, 723-724, 728-729 (2000). Compare *Commonwealth* v. *Mottola*, 10 Mass. App. Ct. 775, 778-779 (1980) (defendant charged with accosting or annoying a person of the opposite sex after he followed a ninth grader to school, "asked her if she would like to pose for photographs," and told her "that he was going to wait for her after school and that if she did not cooperate, he would harm her").

"In analyzing a putative threat, we eschew a technical parsing of the words used and instead consider the entire context in which a statement is made, including the defendant's actions and demeanor at the time, and prior communications between the defendant and the recipient." *Commonwealth* v. *Troy T.*, *supra* at 528. "[I]t is the intent to threaten rather than the intent to carry out the threat that is dispositive." *Commonwealth* v. *Chou*, 433 Mass. at 235, citing *Rogers* v. *United States*, 422 U.S. 35, 46-47 (1975) (Marshall, J., concurring). Thus, a threat can be made without deployment of words explicitly stating one's intent to do harm, so long as the circumstances support the

"provocative comments" to the complainant. However, the defendant's only statement to the complainant that day was his inquiry as to why she was leaving. Second, the Commonwealth says that the complainant "ran into her house" the following day after the defendant stared at her, yet there is no evidence in the record that the complainant's return to her house was at all expedited. Finally, the Commonwealth states that the defendant "followed her to her stairs." However, the testimony at trial indicates that the defendant remained across the street from the complainant's home, and thus did not follow her to the stairs of her house.

complainant's fearful response. *Commonwealth* v. *Chou, supra* at 234. Given this principle, "[s]exually explicit language, when directed at particular individuals in settings in which such communications are inappropriate and likely to cause severe distress, may be inherently threatening." *Ibid.*

Relatedly, even absent evidence that a threat will be immediately followed by physical violence, "sexually explicit and aggressive language" may constitute the type of threatening language necessary to satisfy the "disorderly acts or language" requirement of an accost or annoy conviction. *Id.* at 235. Thus, in *Commonwealth* v. *Chou,* the Supreme Judicial Court upheld an accost or annoy conviction given the threatening nature of the defendant's actions. In that case, the defendant broke into his former girlfriend's high school at night and hung several documents styled as missing person posters there. In addition to the word "MISSING," the posters contained a large photograph of the former girlfriend, her name, and numerous sexually explicit and extremely offensive statements about her. *Id.* at 230-231. The defendant's actions caused the victim to feel "very upset," "afraid," and "violated," and she "suffered from nightmares" after the incident. *Id.* at 231. The court stated that "[o]bjectively, a reasonable person could, as the victim and her guidance counselor did, legitimately fear that the flyer was a veiled threat that the named victim would indeed become a 'missing person' or that some sexually violent harm would befall her, particularly where the defendant had threatened to hit her during their brief relationship, and telephoned her to express his anger about their breakup." *Id.* at 235.

In this case, however, it was not reasonable to infer from the defendant's actions and words that he intended the complainant to fear that harm would befall her. There was no aggressive or invasive move by the defendant toward the victim. Compare *Commonwealth* v. *LePore,* 40 Mass. App. Ct. at 548-549; *Commonwealth* v. *Whiting,* 58 Mass. App. Ct. at 920. Indeed, absent from the Commonwealth's argument is any clear indication of what it believes the defendant was threatening to do. And though the complainant testified that she felt "uncomfortable," she did not state, nor was there more than a modicum of evidence, that she was placed in fear. Though the defendant's words and ac-

tions were no doubt unsettling to the complainant, and "might warrant heightened concern . . . , the fact remains that not all noxious and disturbing remarks are criminal threats." *Commonwealth* v. *Troy T.*, 54 Mass. App. Ct. at 531.

*Conclusion.* For the reasons stated above, we conclude that the evidence was insufficient to support the defendant's convictions for knowingly failing to register as a sex offender, G. L. c. 6, § 178H, and accosting or annoying a person of the opposite sex, G. L. c. 272, § 53. The judgments are reversed, the guilty findings are set aside, and a judgment of not guilty is to be entered for the defendant on each count.

*So ordered.*